[No. B147505. Second Dist., Div. Five. Feb. 19, 2002.]

JOHN LARAWAY, Plaintiff and Appellant, v.
SUTRO & CO. INCORPORATED, et al., Defendants and Respondents;
PASADENA UNIFIED SCHOOL DISTRICT, Intervener and Respondent.

COUNSEL

Kevin T. Snider for Plaintiff and Appellant.

Keesal, Young & Logan and Michael M. Gless for Defendant and Respondent Sutro & Co. Incorporated.

Law Offices of Jeff C. Marderosian and Jeff C. Marderosian for Defendants and Respondents William Deeb, Vera Vignes and Steve Cary and for Intervener and Respondent.

OPINION

**GRIGNON, Acting P. J.**—A private person may bring a qui tam action under the False Claims Act (Gov. Code, § 12650 et seq.) on behalf of a political subdivision of the state. The political subdivision may intervene in the false claims action and assume primary responsibility for prosecution of the action. After intervening in the action, the political subdivision may move to dismiss the action for good cause. In this case, the trial court granted the intervening political subdivision's motion to dismiss, over the objection of the qui tam plaintiff. The qui tam plaintiff appeals. We hold that good cause to dismiss a false claims action on motion of an intervening political subdivision may be any reason rationally related to a legitimate government purpose. We review the trial court's finding of good cause for abuse of discretion. We conclude the trial court did not abuse its discretion in dismissing the False Claims Act causes of action. The complaint, however, included taxpayer causes of action under Code of Civil Procedure section 526a for injunctive and declaratory relief, which the trial court also dismissed. We conclude these causes of action were not the proper subjects of a False Claims Act dismissal. Accordingly, we reverse the judgment of dismissal with directions to reinstate the taxpayer causes of action.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. *Introduction*

Plaintiff and appellant John Laraway appeals from the order dismissing his false claims and taxpayer action filed on behalf of respondent Pasadena Unified School District (PUSD), against defendants and respondents Sutro & Co. Incorporated and PUSD employees William Deeb, Vera Vignes, and Steve Cary, following the successful intervention and motion to dismiss of PUSD. On February 29, 2000, Laraway filed this qui tam action on behalf of PUSD, alleging that two payments made to PUSD's financial advisor, Sutro, were the result of false claims. In 1998 and 1999, PUSD reimbursed Sutro for travel expenses incurred by Sutro in obtaining favorable bond ratings for PUSD bond issues. Laraway alleged Sutro's travel expense claims were false, in that the travel expenses had not received the requisite preapproval. Laraway also alleged the reimbursement of the out-of-state travel expenses for Vignes, Deeb, and Cary was not justified as reimbursement of employee travel expenses, in that the expenses had not been preapproved.

Laraway pleaded two causes of action under the False Claims Act, alleging Sutro, Cary, and Deeb had conspired to obtain payment on Sutro's false travel claims. Laraway also brought taxpayer causes of action under Code of Civil Procedure section 526a for an injunction to restrain Vignes and Deeb from wasting taxpayer funds in making further reimbursements to Sutro for travel expenses that had not been preapproved, a declaration that Sutro may not be reimbursed for travel expenses that have not been preapproved, and an injunction to restrain Vignes and Deeb from wasting taxpayer funds in making reimbursements for employee out-of-state travel expenses that have not been preapproved.

PUSD moved to intervene and dismiss the action for good cause under the False Claims Act. Laraway opposed the motion to dismiss and a hearing was held. The trial court granted the motion and dismissed the action. Laraway filed a timely notice of appeal.

### B. *PUSD*

Every school district must be under the control of a board of school trustees or a board of education. (Ed. Code, § 35010, subd. (a).) The City of Pasadena has chosen to vest the control, management, and administration of its public elementary and secondary schools in a board of education. (Pasadena Charter, § 701.) The Pasadena Board of Education (Board) is the governing board of PUSD. (Ed. Code, § 78.) The Board has the authority to

make and enforce rules, not inconsistent with law, for its own government. (Ed. Code, § 35010, subd. (b).) The Board may delegate to an officer or employee of PUSD any of the powers or duties delegated by law to the Board or PUSD. (Ed. Code, § 35161.)

## C. *Travel Expenses*

Education Code section 44032 provides that the governing board of any school district "shall provide for the payment of the actual and necessary expenses, including traveling expenses, of any employee of the district incurred in the course of performing services for the district, whether within or outside the district, under the direction of the governing board." In accordance with this section, the Board adopted Board Policy No. 4133, regarding travel expenses of PUSD employees. It provides, "The . . . Board shall pay for actual and necessary expenses, including travel, incurred by any employee performing authorized services for [PUSD]." The policy further provides, "All out-of-state travel must have Board approval. Travel expenses not previously budgeted also must be approved on an individual basis by the Board."

## D. *Contract with Sutro*

In March of 1997, PUSD contracted with Sutro to act as its financial adviser in connection with an anticipated general obligation bond issue. Among its duties under the agreement, Sutro agreed to "[s]chedule, coordinate and attend necessary rating agency meetings in order to obtain the highest possible rating on the issues." Pursuant to the agreement, Sutro was to be paid $22,500 per series of bonds sold. Sutro agreed to pay its own costs incurred in performing the agreement, with certain exceptions. PUSD agreed to pay "rating agency . . . fees." Additionally, the agreement provided that "[t]ravel expenses outside California by [Sutro] shall be paid by [PUSD] when approved in advance."

## E. *Initial Bond Offering*

On March 24, 1998, the Board adopted Resolution No. 1377 to issue the first $50 million of bonds. Pursuant to this resolution, officers of the Board, and the PUSD superintendent and assistant superintendent of business services were "authorized and directed, jointly and severally, to do any and all things and to execute and deliver any and all documents which they may deem necessary or advisable in order to proceed with the issuance of the Bonds . . . ."

In April 1998, Board President Lisa Fowler, PUSD Superintendent Vera Vignes, and PUSD Assistant Superintendent of Business Services Steve

Cary, accompanied by a Sutro representative and bond counsel, traveled to New York to make presentations to bond rating agencies. At the time, Sutro advanced all associated travel expenses.

The trip was successful; PUSD obtained favorable ratings. On April 28, 1998, Fowler, Vignes, and Cary reported to the Board regarding the trip to New York and the presentation to the rating agencies.

In June of 1998, Sutro invoiced PUSD for "Fees Associated with Obtaining Ratings" in the amount of $50,892.23. An invoice itemizing these expenses indicates that while $38,054.30 was paid directly to the rating agencies, the remaining $12,837.93 was attributable to airfare, transportation, hotel, and meal expenses associated with the trip to New York. On June 22, 1998, PUSD paid Sutro the full amount due. Laraway alleges Cary "used his position with PUSD to have the voucher executed."

On August 25, 1998, the Board ratified an itemized list of the purchase orders issued during the month of June 1998. Included in that list was the payment to Sutro.

F. *Second Bond Offering*

The process repeated with the second bond issue in 1999. On April 27, 1999, the Board adopted Resolution No. 1417 to issue the second $50 million of bonds.[1] Pursuant to this resolution, officers of the Board, and the PUSD superintendent and assistant superintendent of business services were again "authorized and directed, jointly and severally, to do any and all things and to execute and deliver any and all documents which they may deem necessary or advisable in order to proceed with the issuance of the Bonds . . . ." The same individuals traveled to New York to make the presentations to the rating agencies, although this time they were joined by PUSD Business Manager and future acting Assistant Superintendent William Deeb. Again, Sutro advanced the cost of the trip. The second trip was also successful; positive ratings were obtained. On June 8, 1999, Vignes reported to the Board about the successful trip to New York.

In July 1999, Sutro invoiced PUSD for "Fees and Expenses Associated with Obtaining Ratings" in the amount of $50,040.28. An invoice itemizing these expenses allocates $18,370.28 to airfare, transportation, hotel, and meal expenses associated with the trip to New York. On September 21, 1999, PUSD paid Sutro the full amount due. Laraway alleges Deeb "used his position with PUSD to have the voucher executed."

---

[1] We take judicial notice of Resolution No. 1417, which was apparently inadvertently replaced by a second copy of the nearly identical Resolution No. 1377 before the trial court.

On November 23, 1999, the Board ratified an itemized list of the purchase orders issued during the month of September 1999. Included in that list was the payment to Sutro.

## II. DISCUSSION

■■■ Laraway contends the trial court erred in granting PUSD's motion to dismiss the qui tam action for good cause under Government Code section 12652, subdivision (e)(2)(A). Laraway argues dismissal by PUSD for good cause is not appropriate because the qui tam complaint set forth a cause of action under the False Claims Act. In short, he argues that the appropriate standard for dismissal is a demurrer standard. We disagree and conclude the trial court exercises its discretion when deciding a dismissal motion. We agree with Laraway, however, that the taxpayer causes of action should not have been dismissed.

### A. *Intervention and Dismissal Under the False Claims Act*

When a private person brings a false claims action on behalf of a political subdivision, the complaint must be served on the Attorney General with a written disclosure of substantially all material evidence and information the qui tam plaintiff possesses. (Gov. Code, § 12652, subd. (c).) When the complaint alleges violations that involve only political subdivision funds, as opposed to state funds, the Attorney General forwards the complaint and written disclosure to the prosecuting authority for the political subdivision. (Gov. Code, § 12652, subd. (c)(7)(A).) The political subdivision then has the option to intervene and proceed with the action, in which case it has the right to conduct the action. (Gov. Code, § 12652, subd. (c)(7)(B), (D).) If the political subdivision declines to proceed, the qui tam plaintiff has the right to conduct the action. (Gov. Code, § 12652, subd. (c)(7)(D).)

Subdivision (e) of Government Code section 12652 sets out the parties' rights when the political subdivision on whose behalf the qui tam plaintiff has sued intervenes in the action. "(1) If the . . . political subdivision proceeds with the action, it shall have the primary responsibility for prosecuting the action. The qui tam plaintiff shall have the right to continue as a full party to the action. [¶] (2)(A) The . . . political subdivision may seek to dismiss the action for good cause notwithstanding the objections of the qui tam plaintiff if the qui tam plaintiff has been notified by the . . . political subdivision of the filing of the motion and the court has provided the qui tam plaintiff with an opportunity to oppose the motion and present evidence at a hearing. [¶] (B) The . . . political subdivision may settle the action with the defendant notwithstanding the objections of the qui tam plaintiff if the court

determines, after a hearing providing the qui tam plaintiff an opportunity to present evidence, that the proposed settlement is fair, adequate, and reasonable under all of the circumstances."

## B. *Standard of Review*

■ Determinations of good cause are generally matters within the trial court's discretion, and are reversed only for an abuse of that discretion. (See *Stroud v. Superior Court* (2000) 23 Cal.4th 952, 956-957 [98 Cal.Rptr.2d 677, 4 P.3d 933] [good cause to postpone a preliminary hearing already commenced]; *People v. Hart* (1999) 20 Cal.4th 546, 596 [85 Cal.Rptr.2d 132, 976 P.2d 683] [good cause to discharge a juror]; *People v. McKenzie* (1983) 34 Cal.3d 616, 629, fn. 6 [194 Cal.Rptr. 462, 668 P.2d 769] [good cause to grant a continuance]; *Yu v. Alcoholic Bev. etc. Appeals Bd.* (1992) 3 Cal.App.4th 286, 296 [4 Cal.Rptr.2d 280] [good cause to revoke a liquor license]; *Mendez v. Superior Court* (1988) 206 Cal.App.3d 557, 568-569 [253 Cal.Rptr. 731] [good cause to discover a sexual assault plaintiff's prior sexual history]; *People v. Ramirez* (1988) 202 Cal.App.3d 425, 428 [248 Cal.Rptr. 396] [good cause to endorse a bench warrant for night service].) We see no reason to apply a different standard in this case. Accordingly, we review the trial court's dismissal of the False Claims Act causes of action for abuse of discretion. We turn now to the meaning of "good cause" for dismissal of a false claims action.

## C. *Good Cause*

■ Government Code section 12652, subdivision (e)(2)(A) authorizes an intervening political subdivision to dismiss a false claims action for good cause, provided the qui tam plaintiff has notice and an opportunity to be heard. The statute does not define "good cause" in this context. The question of what is meant by "good cause" under the False Claims Act is a matter of statutory interpretation.

### 1. *Statutory Interpretation*

■ "To determine the meaning of a statute, we seek to discern the sense of its language, in full context, in light of its purpose." (*People v. Cooper* (2002) 27 Cal.4th 38, 45 [115 Cal.Rptr.2d 219, 37 P.3d 403].) "The goal of statutory construction is to ascertain and effectuate the intent of the Legislature. [Citation.] Often, the words of the statute provide the most reliable indication of legislative intent." (*Rothschild v. Tyco Internat. (US), Inc.* (2000) 83 Cal.App.4th 488, 496 [99 Cal.Rptr.2d 721].) " ' "When the language is susceptible of more than one reasonable interpretation[,] we look to

a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' " (*Ibid.*)

### 2. *The Statutory Language*

■ As noted previously, the statute does not define the term "good cause." This is not unusual. Statutes requiring good cause for a court order rarely define the phrase and, then, only in terms of those reasons that are insufficient. (See, e.g., Pen. Code, § 1050, subd. (e) ["Continuances shall be granted only upon a showing of good cause. Neither the convenience of the parties nor a stipulation of the parties is in and of itself good cause."].) It usually falls to the courts to establish the boundaries of good cause. Although the courts have defined "good cause" in a variety of contexts, the concept is relative and depends on all the circumstances. (*Walker v. Blue Cross of California* (1992) 4 Cal.App.4th 985, 994 [6 Cal.Rptr.2d 184].) It may be based on any matter relevant to the determination. As a general rule, however, "good cause" includes reasons that are fair, honest, in good faith, not trivial, arbitrary, capricious, or pretextual, and reasonably related to legitimate needs, goals, and purposes. (See *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 107-108 [69 Cal.Rptr.2d 900, 948 P.2d 412].) In determining the meaning of "good cause" in a particular context, the courts utilize common sense based upon the totality of the circumstances. Those circumstances include the purpose of the underlying statutory scheme.

### 3. *The California False Claims Act*

■ The California False Claims Act was enacted in 1987 "to supplement governmental efforts to identify and prosecute fraudulent claims made against state and local governmental entities." (*Rothschild v. Tyco Internat. (US), Inc., supra,* 83 Cal.App.4th at p. 494.) "[T]he False Claims Act creates substantial financial incentives for private 'whistleblowers' to help uncover and prosecute fraudulent claims made to the government. In an attempt to curb 'opportunistic' or 'parasitic' actions, however, it also includes a number of provisions that limit the circumstances in which a private person may bring or prosecute a qui tam action." (*Id.* at p. 495.) The primary purpose of the False Claims Act "is to protect the public fisc." (*LeVine v. Weis* (1998) 68 Cal.App.4th 758, 765 [80 Cal.Rptr.2d 439].)

### 4. *Similar Federal Legislation*

The California False Claims Act is patterned on similar federal legislation. (*Rothschild v. Tyco Internat. (US), Inc., supra,* 83 Cal.App.4th at p.

494.) Accordingly, federal decisions are persuasive on the meaning of the act. (*Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316, 320 [93 Cal.Rptr.2d 36, 993 P.2d 366].) However, the federal legislation contains no good cause requirement for dismissal of a qui tam action by the government. (31 U.S.C. § 3730(c)(2)(A).)[2] Nevertheless, the Ninth Circuit Court of Appeals has adopted a dismissal standard for purposes of substantive due process. (*U.S. v. Baird-Neece Packing Corp.* (9th Cir. 1998) 151 F.3d 1139, 1145.) The Ninth Circuit held that the government may dismiss a false claims action for any reason rationally related to a legitimate government purpose; the reason may not be fraudulent, arbitrary, capricious or illegal; the dismissal may be based on reasons unrelated to the merits of the qui tam plaintiff's complaint. (*Ibid.*) Good cause for dismissal may be found even where the qui tam action has merit.

### 5. *Legislative History*

The legislative history of Government Code section 12652, subdivision (e) supports a conclusion that a good faith dismissal must be reasonable, based on a sufficient investigation, not arbitrary and not based on improper considerations.[3] A lengthy analysis prepared by the Center for Law in the Public Interest explains, "Subsections (e)(2)(A) and (e)(2)(B) allow the person who initiated the action to formally object to any proposed settlements or motions to dismiss. For example, a qui tam plaintiff may raise objections that the settlement or dismissal is unreasonable in light of existing evidence, that the . . . political subdivision has not fully investigated the allegations, or that the . . . political subdivision's decision to settle or dismiss the action was based on arbitrary and improper considerations. These subsections are also designed to insure that the qui tam plaintiff's role in the false claims action shall not be toothless." (Center for Law in the Public Interest, Cal. False Claims Act Section-by-Section Analysis (1987) pp. 20-21.)

### 6. *Summary*

We have reviewed the statutory language, the meaning of "good cause" in other contexts, the purpose of the False Claims Act, federal cases interpreting a similar federal statute and the legislative history of the False Claims Act. We conclude good cause for dismissal of a qui tam action filed on behalf of a political subdivision exists where the dismissal is rationally

---

[2]Title 31 United States Code section 3730(c)(2)(A) provides: "The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion."

[3]We take judicial notice of the legislative history of Government Code section 12652.

related to a legitimate government purpose, and not arbitrary, capricious, made in bad faith, based on improper or illegal motives, founded on an inadequate investigation, or pretextual. In exercising its discretion the trial court may consider any matter relevant to the issue, including the relative merits of the action, the interest of the qui tam plaintiff, the purposes underlying the False Claims Act, and the potential waste of government resources.

## D. *PUSD's Dismissal Motion*

PUSD contends dismissal was appropriate because the trips were approved, and PUSD suffered no damages from any technical lack of preapproval. In effect, PUSD argues the False Claims Act causes of action have little, if any, merit; nonpayment of the legitimate travel expenses would constitute bad faith in the performance of its contract with Sutro; and continued prosecution of the action would result in a waste of district resources. Laraway responds that PUSD lacked good cause to dismiss the action because the out-of-state travel was not preapproved by the Board, and therefore PUSD was not liable to pay for it.

The Sutro contract requires out-of-state travel to be "approved in advance." The contract does not indicate whether the approval must be formal approval from the Board, or simply informal approval from a PUSD official. Similarly, Board Policy No. 4133 provides that out-of-state and unbudgeted travel must have Board approval. It does not indicate whether the approval must be formal, or, indeed, whether the approval must predate the travel.

In any event, it is beyond dispute that the Board approved the travel at issue in advance, at least informally. The Board authorized the issuance of the bonds and authorized certain individuals, "jointly and severally, to do any and all things . . . which they may deem necessary or advisable in order to proceed with the issuance of the Bonds." By this, the Board delegated its authority for implementing the resolution to those individuals. Three of those individuals were on the first trip to New York, and their presence was an implicit approval of their own travel and that of their companions. After the trips, a report was made to the Board indicating the trip's favorable results. PUSD paid the first Sutro invoice, and the Board formally approved it, ratifying payment, well aware that the trip had been taken. After the first bond issue, the Board issued a second resolution authorizing the same individuals to, again, do any and all things they deemed necessary or advisable in order to proceed with the second bond issue, implicitly indicating the Board had no disputes with the way those individuals handled the authority vested in them with respect to the first bond issue. Again, those

very same individuals were on the second trip to New York, implicitly approving it. Again, a report was made to the Board after the trip. Again, the Board formally approved payment to Sutro. This is simply not a case of an expenditure being slipped by an unaware Board. The Board was fully aware of these trips and had delegated its approval authority to the very same individuals who took the trips.

It is undisputed that PUSD received full value for its money; the sole basis of the False Claims Act allegations is that the trips were not preapproved. PUSD knew about the trips, ratified payment for them, and knowingly sent the same individuals on a second trip. Under these circumstances, PUSD has good cause to refuse to seek a windfall from Sutro based on the possible technicality that the Board did not formally preapprove the trips, especially given that the Sutro contract does not specifically require formal preapproval. Similarly, PUSD has good cause to refuse to seek a windfall from PUSD employees who incurred the expenses on PUSD business, especially given that Education Code section 44032 requires such payment, and the Board Policy No. 4133 does not explicitly require preapproval.

Laraway's opposition did not defeat this showing, but rather interpreted the relevant documents to require formal Board preapproval. Even if Laraway's interpretation is correct, PUSD still had good cause to dismiss the action because it had informally approved the trips and received full value for the expenses incurred.[4]

The trial court did not abuse its discretion in finding good cause to dismiss the False Claims Act causes of action.

E. *Remaining Causes of Action*

Only two causes of action of Laraway's complaint were brought under the False Claims Act on behalf of PUSD. Laraway also sought injunctive and declaratory relief in his own name, as a taxpayer, under Code of Civil Procedure section 526a. These causes of action were not at issue in PUSD's motion to dismiss.

Although the facts underlying the remaining causes of action are the same facts underlying the False Claims Act causes of action, the law is different. There is no statutory provision allowing dismissal of these causes of action

---

[4]We have serious doubts that Laraway has stated a cause of action under the False Claims Act. There can be no false claim where a contractor has submitted a claim in accordance with government directions, even if the procedure was improper. (*People v. Duz-Mor Diagnostic Laboratory, Inc.* (1998) 68 Cal.App.4th 654, 672-673 [80 Cal.Rptr.2d 419].)

on a showing of good cause. As there was no demurrer to these other causes of action and the parties never argued their merits, the trial court erred in dismissing them.

### III. DISPOSITION

The judgment of dismissal is reversed and the case remanded to the trial court. The trial court is directed to vacate its order of dismissal and enter a new and different order dismissing the False Claims Act causes of action only. The parties are to bear their own costs on appeal.

Armstrong, J., and Mosk, J., concurred.